Sherman L. **HANDLEY** and Linda L. Handley, his wife, Appellants,

v.

**UNION CARBIDE CORPORATION**, a New York corporation, Appellee.

Sherman L. **HANDLEY** and Linda L. Handley, his wife, Appellees,

v.

**UNION CARBIDE CORPORATION**, a New York corporation, Appellant.

Nos. 85–2333(L), 85–2334.

United States Court of Appeals, Fourth Circuit.

Argued July 15, 1986.

Decided Oct. 31, 1986.

---

M. Elizabeth Medaglia (Jackson & Campbell, P.C., Washington, D.C., Alfred B. McCuskey, II on brief), for appellants/cross appellees.

Robert L. Stewart, Jr. (W.T. Shaffer, Jackson, Kelly, Holt & O'Farrell, Charleston, W.Va., on brief), for appellee/cross appellant.

Before PHILLIPS, SPROUSE and CHAPMAN, Circuit Judges.

SPROUSE, Circuit Judge:

Sherman L. Handley and his wife Linda appeal from the district court's grant of judgment notwithstanding the verdict to Union Carbide Corporation, the defendant in their diversity action to recover for injuries caused by workplace exposure to toxic chemicals. Handley was employed from April 20, 1981 to August 1, 1984 as a chemical operator at Carbide's plant in South Charleston, West Virginia. In March 1984, he was diagnosed as having schleroderma, a rare, progressive pulmonary disease that severely limits the amount of oxygen processed by the lungs. Handley brought this action against Carbide on July 9, 1984, alleging that his disability was a result of Carbide's deliberate actions in exposing him to dangerous chemicals under unsafe working conditions.[1] At trial, the district court reserved ruling on Carbide's motions for a directed verdict and submitted the case to the jury.[2] After the jury returned a verdict for the plaintiffs, the district court granted Carbide's motion for judgment notwithstanding the verdict. We affirm.

The Handleys' cause of action is statutory. It arises in its entirety under the "deliberate intention" provisions of the West Virginia Workers' Compensation Act.[3] Like other workers' compensation laws, the West Virginia statute grants covered employers a general immunity from common law tort actions brought by injured employees seeking damages for their workplace injuries. Since its inception, however, the West Virginia Act has reserved a right of action in favor of employees who are injured as a result of the employer's deliberate and intentional con-

---

1. The district court bifurcated the issues of liability and damages pursuant to *Mooney v. Eastern Associated Coal Corp.*, 326 S.E.2d 427 (W.Va. 1984). While Mrs. Handley joined her husband as a plaintiff, her claim for loss of consortium related only to the damages portion of the trial, which has not been held.

2. The district court stated that it delayed ruling on the directed verdict motions out of concern for judicial economy, since an appellate reversal of a directed verdict would require a new trial, while a reversal of a judgment notwithstanding

the verdict might not. *See Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.*, 427 F.2d 862, 873–74 (4th Cir.1970).

3. The West Virginia Workers' Compensation Act is codified in Chapter Twenty-three of the West Virginia Code. W.Va.Code §§ 23–1–1 *et seq.* (1985 Replacement Vol.). The "deliberate intention" provisions applicable here appear at section two, article four of Chapter Twenty-three. W.Va. Code §§ 23–4–2 (1985 Replacement Vol.).

duct in causing the injury. The principal question in this appeal is whether Handley has presented sufficient evidence upon which a jury could find that Carbide acted with the requisite "deliberate intention" in causing his injuries so as to lose the immunity that is normally available to it under the Workers' Compensation Act.[4]

## I.

Handley worked as a chemical operator in Carbide's Specialty Catalyst Unit (Building 156), which produced ethyl silicate and a catalyst known as A99 NYAX. His principal task was to transfer chemicals, either from tankers[5] to storage tanks, or from storage tanks to reactors located inside Building 156.[6] At trial, Handley attempted to prove that Carbide intentionally exposed him to various chemicals under unsafe working conditions. While there is no dispute that most, if not all, of the chemicals that Handley worked with are dangerous to human health, his evidence at trial and his claims on appeal focus on the handling of two specific chemicals—silicon tetrachloride and metaphenylenediamine (MPDA).

Silicon tetrachloride is a liquid chemical used in the production of ethyl silicate.[7] As with all chemicals used by Carbide, the company's engineers accumulated data about the properties of silicon tetrachloride and detailed them in a "Standard Operating Procedure" manual that was then made available to chemical operators.[8] Information relating to potential dangers associated with the chemical was derived from the manual, condensed, and printed on safety data sheets that were also distributed to the chemical operators. The narrative portion of the safety data sheet on silicon tetrachloride provides as follows:

Silicon tetrachloride causes eye and skin irritations and is harmful if inhaled. Avoid contact by use of proper protective equipment. In case of accidental contact, flush affected areas well with water and report to the Medical Department. In case of inhalation, administer oxygen if needed.

Silicon tetrachloride reacts violently with water, causing a rapid release of heat and HCl [hydrogen chloride] vapors.

One of Handley's duties at Carbide was to transfer silicon tetrachloride from tankers that delivered the chemical into storage tanks located outside of Building 156. To unload the chemical, Handley would connect a hose from a valve on the storage tank to a valve on the top of the tanker. After testing the hose and valves for leaks with pressurized nitrogen, the tanker itself would be pressurized, forcing the silicon tetrachloride through the hose into the storage tank. After the transfer was complete, the valves and hose were again purged with nitrogen and the hose would then be disconnected. Handley and several

---

4. The evidentiary standard applicable to a motion for judgment notwithstanding the verdict is well settled. The record must be viewed as a whole and in the light most favorable to the party opposed to the motion. If there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment could reasonably return a verdict for the nonmoving party, the motion should be denied. *Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888, 897 (4th Cir.1980). *See also Whalen v. Roanoke County Board of Supervisors,* 769 F.2d 221, 225 (4th Cir.1985); *Mays v. Pioneer Lumber Corporation,* 502 F.2d 106 (4th Cir.1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975); *Ralston Purina Co. v. Edmunds,* 241 F.2d 164 (4th Cir.), *cert. denied,* 353 U.S. 974, 77 S.Ct. 1059, 1 L.Ed.2d 1136 (1957).

5. Chemicals were delivered to Carbide's South Charleston plant in "tanker" trucks and in "tanker" railroad cars. Since the chemical transfer process at issue here was identical with respect to both trucks and railroad cars, we refer to them collectively as "tankers."

6. A reactor is a tank in which chemicals were mixed and blended to produce other chemicals.

7. Ethyl silicate is used in making paints and in certain industrial molding operations.

8. With silicon tetrachloride and other chemicals not manufactured by Carbide, much of the information contained in the manuals and safety data sheets was provided by the actual manufacturer of the chemical. Carbide's own engineers, however, determined safe handling procedures relating to these chemicals and tested the procedures with a pre-start-up safety review team.

of his co-workers testified that despite the purging process small amounts of silicon tetrachloride nearly always spilled when the hose was disconnected.

When silicon tetrachloride is spilled it reacts with the moisture in the air, producing hydrochloric acid vapors in a visible cloud of white "smoke."[9] According to Handley, Carbide instructed the chemical operators to "knock down" the hydrochloric acid vapors from small spills by spraying large quantities of water on the vapor, sending the acid into the industrial sewer. If the vapors could not be knocked down, the operators would run away from the cloud to avoid breathing its fumes. They would then return wearing an external air source before undertaking further steps to control the spill. The operators did not wear these external air sources as a routine precaution.[10]

Handley's work also brought him into close proximity with MPDA, a strong dying agent used by Carbide in the manufacture of a chemical catalyst known as A99 NYAX. At first, Carbide received fifty-pound drums of granular MPDA, which Handley and his co-workers emptied directly into the reactor that produced A99 NYAX. The original safety data sheet that Carbide distributed on MPDA contained the following pertinent information:

Use proper protective equipment to avoid contact. Thermal burns may result from contact with molten material. In case of accidental contact, wash affected areas well with water and contact the Medical Department. Use respiratory protection if necessary to avoid breathing dust. If the material is exposed to fire or intense heat, toxic vapors may be evolved.

When the first MPDA shipment arrived the operators wore hard hats, goggles, and dust masks during the unloading process. Despite these precautions, several of the workers subsequently experienced discoloration of their skin, hair, and urine. Thereafter, the operators wore oxygen masks, vinyl coveralls, boots, and two pairs of gloves while emptying the drums.[11] After an incident in which some MPDA dust escaped from Carbide's property and damaged the paint on cars parked nearby, Carbide arranged with its supplier to receive MPDA in molten form. It later revised its safety data sheet to include information about the chemical's staining capacity and to address the properties of the chemical in liquid form.[12]

Molten MPDA was unloaded in a process similar to that used for silicon tetra-

9. Dr. Owens, the Handleys' medical expert, testified that, in addition to giving off hydrochloric acid vapors, spilled silicon tetrachloride would also vaporize into silicon dioxide particles. Owens further testified that Handley's lung disease was causally related to the inhalation of silicon dioxide particles.

10. Handley also testified that on occasion he was required to vent a storage tank of high-acid content ethyl silicate by opening a valve and allowing the chemical to trickle into the sewer. In this operation, he would spray copious amounts of water onto the chemical as it left the tank to hasten its evacuation down the sewer. As the district court observed, however, the Handleys presented no evidence establishing that any silicon tetrachloride remained as a residue or byproduct after it had been processed into ethyl silicate. In fact, the evidence presented would tend to support the contrary conclusion that all of the silicon tetrachloride was dissipated when combined with ethanol (the other chemical used in the ethyl silicate manufacturing process).

11. Handley testified that his hands continued to turn yellow notwithstanding the additional protective equipment.

12. The additional information provided:

Inhalation may cause discoloration of urine or irritation of respiratory tract.

Material is a strong dying [sic] agent. Exposure to skin and clothing should be avoided or stains will result. Material must not be released to atmosphere. In the case of flaked solids, handling must be done in an enclosed area. The reactor vent must go to the acid scrubber to prevent any loss to the air. Preferred handling method is to use motlen [sic] m-PDA to avoid operator and environmental exposures.

*In Case of Spill of Molten m-PDA*

Use water to flush to sewer—however, do not spray directly on m-PDA or stir up m-PDA. Avoid vaporising the m-PDA by being careful not to spray too vigorously. Cover spill with pool of water.

chloride, but the process was complicated by the fact that the chemical had to be maintained at a temperature above 140°F. Therefore, the transferring hoses and valves were heated externally with steam to keep the chemical in a liquid state. Nevertheless, the MPDA "froze" on several occasions. Normally, the application of additional external heat was sufficient to start the chemical flowing again.[13] Handley testified that he applied steam to the frozen hose on four or five occasions, and that he was exposed to the chemical in molten form.[14]

Handley's respiratory problems began in January 1984.[15] Carbide's company doctor initially treated him for pneumonia and, when Handley did not improve, referred him to Presbyterian University Hospital in Pittsburgh. At trial, Handley presented expert medical testimony that attributed his respiratory disease to the inhalation of silicon dioxide particulates and amine vapors [16] at Carbide's South Charleston plant.

## II.

As noted earlier, the West Virginia Workers' Compensation Act contains an exception to the covered employer's immunity from suit for workplace injuries inflicted on employees with "deliberate intention." [17] In 1978, the West Virginia Supreme Court of Appeals issued a far-reaching decision in *Mandolidis v. Elkins Industries*, 161 W.Va. 695, 246 S.E.2d 907 (1978). It ruled that deliberate intention "must be held to mean that an employer loses immunity from common law actions where such employer's conduct constitutes an intentional tort or willful, wanton, and reckless misconduct." *Id.* at 706, 246 S.E.2d at 914 (footnotes and citations omitted). This holding stimulated much public debate and, in 1983, the West Virginia Legislature amended the compensation statute with the express intent of modifying the standard adopted in *Mandolidis*. The statute now states that "in enacting the immunity provisions of this chapter, the legislature intended to create a legislative standard for loss of that immunity of more narrow application and containing more specific mandatory elements than the common law tort system concept and standard of willful, wanton and reckless misconduct." [18] The

13. On at least one occasion, external heating did not work to thaw the line, and a supervisor had to "suit up" and disconnect the hose to clear the blockage. When this was done, MPDA vapors were released. However, there is no evidence that Handley participated in this type of operation.

14. It is not clear from the record exactly what the nature of this exposure was. Handley's trial testimony was impeached by his deposition statement that he handled the MPDA in molten form only once. Furthermore, there is no testimony from Handley that he ever inhaled MPDA vapors during the unloading process of the molten chemical. With the case in its current status, however, we give Handley the benefit of his trial testimony. *See Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 891 (4th Cir.1980).

15. Immediately prior to that time, Handley had suffered from swollen, discolored hands and was diagnosed as having Raynaud's phenomenon. Raynaud's phenomenon is frequently a presenting symptom of schleroderma.

16. MPDA is one of a large group of chemicals in the amine group. MPDA, however, is not the only amine that Handley worked with at Carbide.

17. W.Va.Code § 23–4–2(c)(2) (1985 Replacement Vol.).

18. W.Va.Code § 23–4–2(c)(1) (1985 Replacement Vol.) provides in its entirety that:

It is declared that enactment of this chapter and the establishment of the workmen's [workers'] compensation system in this chapter was and is intended to remove from the common law tort system all disputes between or among employers and employees regarding the compensation to be received for injury or death to an employee except as herein expressly provided, and to establish a system which compensates even though the injury or death of an employee may be caused by his own fault or the fault of a co-employee; that the immunity established in sections six and six-a [§§ 23–2–6 and 23–2–6a], article two of this chapter, is an essential aspect of this workmen's [workers'] compensation system; that the intent of the legislature in providing immunity from common law suit was and is to protect those so immunized from litigation outside the workmen's [workers'] compensation system except as herein expressly provided; that, in enacting the immunity provisions of this chapter, the legislature intended to create a legislative standard for loss of that

parties agree that this action is governed by the amended statute.[19]

Under the new provisions, there are two alternative methods of proving deliberate intent. W.Va.Code § 23–4–2(c)(2) (1985 Replacement Vol.). First, the statute provides that an employer may be held liable if it acts "with a consciously, subjectively and deliberately formed intention to produce the specific result of injury or death to an employee."[20] There were no allegations or proof that Carbide violated this section so it is not relevant in this case. Instead, Handley alleged and attempted to prove that Carbide violated the other provision in the statute from which a jury could infer a deliberate intent to injure.[21] This alternate section provides that an employer will be held to have acted with the requisite "deliberate intention" if the plaintiff/employee proves each of the following elements:

(A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

(B) That the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by such specific unsafe working condition;

(C) That such specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of such employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C) hereof, such employer nevertheless thereafter exposed an employee to such specific unsafe working condition intentionally; and

(E) That such employee so exposed suffered serious injury or death as a direct and proximate result of such specific unsafe working condition.

W.Va.Code § 23–4–2(c)(2)(ii)(A)–(E) (1985 Replacement Vol.).

### III.

At trial, Handley introduced some evidence of a number of alleged unsafe working conditions and merely adverted to the existence of others.[22] The district court correctly decided that there was insufficient evidence to support a jury verdict as to most of them. The court then considered the procedures involved in the handling of silicon tetrachloride and MPDA. It examined and applied the five elements detailed in section 23–4–2(c)(2)(ii)(A)–(E) against each of the potentially unsafe

immunity of more narrow application and containing more specific mandatory elements than the common law tort system concept and standard of willful, wanton and reckless misconduct; and that it was and is the legislative intent to promote prompt judicial resolution of the question of whether a suit prosecuted under the asserted authority of this section is or is not prohibited by the immunity granted under this chapter.

**19.** The district court's opinion in this case was the first judicial interpretation of the amended statute; it has yet to be interpreted by the West Virginia Supreme Court of Appeals.

**20.** W.Va.Code § 23–4–2(c)(2)(i) (1985 Replacement Vol.).

**21.** W.Va.Code § 23–4–2(c)(2)(ii)(A)–(E) (1985 Replacement Vol.)

**22.** Apparently ignoring the highly specific proof requirements of the deliberate intent provision, Handley's trial counsel adopted a "scatter-gun" approach to the presentation of the evidence. He attempted to prove the existence of many unsafe working conditions, without focusing his examination on satisfying the five statutory requirements as to any particular one. As the district court aptly observed: "the evidence was adduced in a disorderly fashion. Issues were addressed, apparently abandoned, and then re-addressed." *Handley v. Union Carbide Corp.,* 620 F.Supp. 428, 435 (S.D.W.Va.1985).

working conditions that it identified in relation to these two chemicals.

## A. Silicon Tetrachloride

The district court determined that the evidence of Handley's exposure to silicon tetrachloride supported a finding of only one specific unsafe working condition within the meaning of the amended statute. W.Va.Code § 23–4–2(c)(2)(ii)(A) (1985 Replacement Vol.). It concluded that the procedure used at Carbide to unload and transfer silicon tetrachloride from tankers to storage tanks sufficiently met this initial statutory requirement. In reaching this conclusion, the court noted that a co-worker at Building 156 testified that he had inhaled silicon tetrachloride vapors on a number of occasions during the unloading process. The court did not find sufficient evidence, however, to support a second jury conclusion that spraying water on spilled silicon tetrachloride was itself a specific unsafe working condition. It noted that there was no testimony indicating that the operators ever inhaled the chemical's vapors while attempting to "knock it down" into the sewer.

Having found sufficient evidence to support a jury's verdict that the silicon tetrachloride unloading procedure constituted an unsafe working condition, the court went on to test the evidence relating to the remaining four statutory elements. As a whole, it found that Handley introduced sufficient evidence to prove the requirements of subsections (A), (B), (D), and (E)—that a specific unsafe working condition existed that presented a high degree of risk; that Carbide had a subjective realization and appreciation of the unsafe working condition and of the high degree of risk;

that it intentionally exposed Handley to the unsafe working condition; and that Handley suffered serious injury as a direct and proximate result of the unsafe working condition.

The trial court, however, granted Carbide a judgment notwithstanding the verdict because Handley failed to present sufficient evidence from which a jury could find that the requirement of subsection (C) was established—*i.e.*, that the unsafe working condition violated a commonly accepted and well-known safety standard that was specifically applicable to the working condition involved.

## B. Metaphenylenediamine (MPDA)

The court ruled that from the evidence introduced the jury properly could have found two specific unsafe working conditions relating to MPDA—(a) the unloading of the chemical in its granular form the first time it was delivered to Carbide's facility; and, (b) the general unloading of the chemical in its molten form. As to the unloading of granular MPDA, the court ruled that the Handleys had sustained their burden of establishing the requirements of subsections (A), (D) and (E). It concluded, however, that Handley produced insufficient evidence to show that Carbide had a subjective realization of the risks involved, or that it had violated an industry standard—as required by subsections (B) and (C), respectively.

As to the procedures involved in unloading MPDA in its molten form, the district court similarly found that there was insufficient evidence to establish the requirement of subsection (C)—violation of an industry standard.[23]

---

**23.** Carbide, of course, agrees that the district court's findings in these respects are correct. It contends, however, that the district court erred in failing to recognize that under the West Virginia statute it was required to consider Carbide's motion for judgment notwithstanding the verdict under a more narrow standard than that which applies to the consideration of that motion generally.

We find no merit to this contention. In making this argument Carbide relies on the following section of the amended statute:

Notwithstanding any other provision of law or rule to the contrary, and consistent with the legislative findings of intent to promote prompt judicial resolution of issues of immunity from litigation under this chapter, the court shall dismiss the action upon motion for summary judgment if it shall find, pursuant to Rule 56 of the Rules of Civil Procedure that

## IV.

■ The Handleys raise two principal contentions on appeal. First, they assert that the district court erred in finding two separate working conditions involved in the handling of silicon tetrachloride. They contend that all of the procedures related to this chemical comprised but a single unsafe working condition within the meaning of the statute. We think, however, that the district court correctly separated Handley's occupational duties into distinct components for which individualized safety standards and procedures could be devised. In this carefully phrased statute no wording is more deliberate than that which requires proof of a specific unsafe working condition. This phraseology is included in all of the subsections requiring proof of egregious employer misconduct. The evidence in each instance must relate to a specific condition in a particular workplace. Obviously, such a condition must be sufficiently identifiable and sufficiently subject to narrow categorization that "specific" government or industry safety rules can be formulated and applied to it. It is true that workplace circumstances vary infinitely, and the issue whether a particular occupational practice constitutes a "specific unsafe working condition" may often be resolved through evidence of particularized safety standards applicable to that practice.

Although proof of such standards was not present here, we are not prepared to say that the trial court erred in its interpretation of the evidence as depicting two specific working conditions.

■ The Handleys' other principal contention is that the lower court erred in its general finding of insufficient evidence to support the jury's verdict that Carbide violated a commonly accepted and well-known industry or business safety standard with respect to any of the working conditions at issue.[24] Again, we disagree. Assuming *arguendo* that Carbide violated the procedures described in its internal safety data sheets, this standing alone was not enough to support a jury conclusion that a "commonly accepted" and "well-known safety standard" was violated.

The Handleys contend that the legislature's use of the disjunctive "or" in the phrase "a commonly accepted and well-known safety standard within the industry *or* business of such employer" indicates that subsection (C) can be satisfied by demonstrating a violation of a discrete safety rule promulgated by a single "business." The requirement, they urge, is that the safety rule be well-known and commonly accepted within that individual enterprise. This interpretation ignores the manifest legislative purpose underlying the "safety

one or more of the facts required to be proved by the provisions of subparagraphs (A) through (E) of the preceding paragraph (ii) do not exist, and the court shall dismiss the action upon a timely motion for a directed verdict against the plaintiff if after considering all the evidence and every inference legitimately and reasonably raised thereby most favorably to the plaintiff, the court shall determine that there is not sufficient evidence to find each and every one of the facts required to be proven by the provisions of subparagraph (A) through (E) of the preceding paragraph (ii).

W.Va.Code 23–4–2(c)(2)(iii)(B). This section simply restates and emphasizes what is already explicit in subparagraph (ii)—that the absence of evidence on any of the five elements of the alternative method for proving "deliberate intention" is fatal to a plaintiff's case. It does not address much less modify the procedural standard governing consideration of the involved motions in state court; and it certainly could

not affect the standards applicable in federal court. *See Wratchford v. S.J. Groves & Son, Co.*, 405 F.2d 1061, 1065–66 (4th Cir.1969). Carbide also argues on cross-appeal that the court misapplied subsections (A), (B), (D) and (E) in certain respects. These findings or rulings, although adverse to Carbide, did not affect the court's ultimate decision granting a judgment in its favor, and since we agree with that judgment we do not address them on cross-appeal.

**24.** The requirement of subsection (C) may be met by alleging and proving that the employer violated a federal or state safety law or regulation or, alternatively, that it violated an industry or business safety standard. The Handleys offered no evidence of a relevant state or federal safety statute, rule, or regulation, but relied solely on their allegation that Carbide violated a well-known and commonly accepted industry or business standard. W.Va.Code § 23–4–2(c)(2)(ii)(C) (1985 Replacement Vol.).

standards" provision, and in so doing fails to grasp the intended meaning of the words "well-known" and "commonly accepted."

The statute amending Chapter 23, Article 4, Section 2 is structured to restrict recovery for conduct that was previously actionable under the *Mandolidis* rationale. This new legislation specifically eliminates the most frequently relied upon bases for proving "deliberate intent" under *Mandolidis, i.e.,* gross negligence or willful, wanton, and reckless employer misconduct. Now only specific intent will support such a case—*unless* there has been a serious safety violation as carefully described in subsection (C). The West Virginia Legislature has recognized in this subsection that the enforcement of crucial safety standards, which have evolved from widespread experience, is so vital to the work force that their violation under certain conditions should be equivalent to an intentional act and, if injury is caused thereby, should provide the basis for an action against the employer. The amended statute thus protects against flagrant violations of national and state safety statutes, rules, and regulations. This, we think, is an indication of the requisite breadth of the nongovernmental safety standards also sought to be protected by the lawmakers. The legislature apparently has recognized that many industries or businesses observe safety standards whether or not they are the subject of governmental regulation. Subsection (C) takes this into account and permits relief for the violations of such of these safety standards as are "commonly accepted" and "well-known."

It would be rare that a "commonly accepted and well-known" safety standard could be established by showing that it exists in only one facility. Occupational safety standards may vary across, or perhaps within, geographical regions of even the same industry. Before such a standard could be fairly characterized as "commonly accepted and well-known" there must be at least some evidence that an equal or similar standard was in place or recognized by a business or industrial entity conducting the same or similar activities as the defendant. Without such evidence, there seldom will be a jury question presented under subsection (C).

The plaintiffs contend that the word "industry" in subsection (C) should be read broadly, and the word "business" read narrowly. We think, however, that this interpretation might produce the undue, and unintended, result of excluding certain types of employees from the coverage and protection of the amended statute. It is inconceivable that the West Virginia Legislature intended to classify employees whereby industrial workers could bring an action, but employees of a non-industrial type business could not. Instead, we read the word "business" in subsection (C) as demonstrating legislative concern that the statute not be read restrictively as applying only to occupations traditionally referred to as "industrial." The phrase "within the industry or business of such employer" signals to us that the amended statute was meant to be comprehensive, encompassing the entire spectrum of employer-employee relationships that is reached by the Workers' Compensation Act generally.

The plaintiffs make the final argument that Carbide sets the safety standards for the chemical industry as a whole because of its position as industry leader. This argument is similar to one made before the trial court. We agree with the trial court that there was no evidence upon which the jury could find that the safety rules at issue here extended anywhere beyond Carbide's own facilities. Internal safety data of a single company might well be probative in establishing existing industry standards in some areas, but as the district court noted, the Handleys presented no evidence of Carbide's size in relation to the rest of the chemical industry. There was also no evidence of the effects Carbide's

274

internal safety rules had on the rest of the industry, and the record is equally bare of evidence from which the jury could infer the weight Carbide's policies carried within the industry. The bald assertion that Carbide is one of the leaders in its field is not sufficient—particularly since it was not conveyed to the jury in the form of admissible evidence. Under these circumstances, we think that the introduction into evidence of Carbide's safety sheets alone was not enough to support a jury finding of an industry or business safety standard.

In view of the above, the opinion of the district court is affirmed.

AFFIRMED.