Michael J. MARINUCCI,
Appellant/Cross–
Appellee,

v.

SG HOMES ASSOCIATES, LP,
Appellee/Cross–Appellant.

Civil No. WDQ–11–2517.

United States District Court,
D. Maryland,
Northern Division.

April 9, 2012.

Jeffrey Louis Forman, Kauffman and Forman PA, Towson, MD, for Appellant/Cross–Appellee.

Steven Bennett Gould, Jesse D. Stein, Brown and Gould LLP, Bethesda, MD, for Appellee/Cross–Appellant.

## MEMORANDUM OPINION

**WILLIAM D. QUARLES, JR.**, District Judge.

Michael J. Marinucci appeals the United States Bankruptcy Court's judgment for SG Homes Associates, LP ("SG Homes") and determination that the judgment debt is not dischargeable. SG Homes cross-appeals the bankruptcy court's dismissal of its original complaint. For the following reasons, the bankruptcy court will be affirmed.

### I. Background

Marinucci was the president and 50 percent shareholder of Chesapeake Site Contracting, Inc. ("Chesapeake"). Marinucci Test., Trial Tr. 19:12–20:12, July 13, 2011. On December 20, 2007, Chesapeake responded to SG Homes's request for bids for site work on a building project at Crabbs Branch Way in Montgomery County, Maryland. Pl.'s Tr. Ex. 2. Chesapeake's bid excluded the cost of payment or performance bonds.[1] *Id.* at 4.

Sometime before December 28, 2007, Marinucci and Jay Munnikhuysen, Chesapeake's senior project manager, met and discussed Chesapeake's bid with two SG Homes officials: procurement manager Paul DeVerger, and procurement vice president Lorin Randall.[2] Pl.'s Ex. 3; Paul DeVerger Test., Trial Tr. 142:7–9, July 13, 2011. Marinucci asked whether SG Homes would require a bond or accept a higher retainer instead. Pl.'s Ex. 9 at 2; Paul DeVerger Test., Trial Tr. 142:16–18, July 13, 2011. Although Randall agreed to consider a retainer, SG Homes ultimately required a bond.[3]

On January 28, 2008, SG Homes awarded Chesapeake the contract and requested a certificate of insurance, a performance bond, and a completed W–9 tax form. Pl.'s Ex. 4. Although the parties had not signed a written contract, work began almost immediately. Paul DeVerger Test., Trial Tr. 13:1–10, July 14, 2011; Lorin Randall Test., Trial Tr. 76:22–24, July 14, 2011.

On or before February 1, 2008, Marinucci completed a bond request form from Atlantic Risk Management Corporation. Pl.'s Ex. 12; Michael Marinucci Test., Trial Tr. 64:2–16, 122:15–123:10, July 13, 2011. The form requested performance and payment bonds. Pl.'s Ex. 12. On February 1, 2008, Marinucci told Randall in an email that Chesapeake was "pursuing the performance and payment bonds as we agreed." Pl.'s Ex. 6 at 3. Marinucci also said that the bonding company needed certain information about SG Homes's parent

---

**1.** "A performance bond is generally to protect the beneficiary from a failure to complete the project." Trial Tr. 11:22–23, July 20, 2011. Should the original contractor fail to finish the project, the bonding company pays the difference between the contract price and the cost to hire a second contractor to complete the work. *Id.* 11:23–12:3. A payment bond "ensure[s] that the contractor pays its subcontractors and material men who would otherwise have recourse against the project and could force ... the developer to pay out for work that had already been reimbursed to the contractor." *Id.* 12:4–9. "It is a means of

protecting the project from liens and double payments." *Id.* 12:9–10.

**2.** Randall and DeVerger worked for EYA, LLC, SG Homes's parent company and the construction manager for the Crabbs Branch Way project. Paul DeVerger Test., Trial Tr. 139:12–19, July 13, 2011; Lorin Randall Test., Trial Tr. 42:13–43:23, July 14, 2011.

**3.** Paul DeVerger Test., Trial Tr. 142:20–143:5, July 13, 2011; Lorin Randall Test., Trial Tr. 47:2–16, July 14, 2011.

company before issuing the bonds. *Id.* On February 5, 2008, Randall provided the requested information. *Id.* at 1.

By mid-March 2008, Marinucci had decided not to obtain a bond, because his wife would not sign a personal guaranty as required by bonding companies.[4] Nonetheless, on March 26, 2008, Munnikhuysen copied Marinucci on an email to DeVerger that said, "Our office advises me that you should see the P & P bond by the end of next week." Pl.'s Ex. 8.

Work continued without a written contract, and Chesapeake submitted monthly payment applications to SG Homes. *See* Pl.'s Ex. 31A. Each application contained a certification that, "to the best of [Chesapeake's] knowledge, the work covered by [the] Application For Payment ha[d] been completed in accordance with the Contract Documents" and "all amounts previously paid to [Chesapeake] under the Contract ha[d] been used to pay [Chesapeake's] costs for labor, materials, and other obligations." *Id.* at 1. Marinucci reviewed each application and directed an employee to sign it. Amanda Nethers Test., Trial Tr. 74:4–75:2, July 13, 2011.

Chesapeake put the money from SG Homes into a common fund from which it paid subcontractors and suppliers, including those who did not provide supplies or services for the Crabbs Branch Way project. Martin Schwartz Test., Trial Tr. 91:20–92:1, July 13, 2011; Michael Marinucci Test., Trial Tr. 109:23–110:16, July 13, 2011.

On May 12, 2008, Chesapeake and SG Homes executed a written agreement (the

"Contract") governing the Crabbs Branch Way project. Pl.'s Ex. 5 at 1. The Contract was ambiguous about whether Chesapeake had to obtain a payment bond. Lorin Randall Test., Trial Tr. 52:4–54:23, July 14, 2011. Subsection G, under "Payment Conditions," noted that all subcontractors were "subject to a 5 [percent] retainer and/or must post a bond guaranteeing satisfactory completion of the work." *Id.* at 2. An "X" was placed next to both options; thus, the Contract required a five percent retainer and a payment bond.[5] The space for entering the name of the company issuing the bond was left blank. *Id.*

Subsection M ("Performance and Payment Bonds"), under "General Conditions," also had two provisions. Pl.'s Ex. 5 at 6. Part (a) stated that Chesapeake would pay for and provide SG Homes performance and payment bonds, unless a "box [was] checked and no bond [was] indicated above." *Id.* There was neither a box nor a check next to this provision. Part (b) stated that, if Chesapeake was not required to have bonds, SG Homes could require a bond "at any time," at SG Homes's expense. *Id.* Attachment C to the Contract excluded from the scope of work the cost of payment and performance bonds. Pl.'s Ex. 5, Attachment C at 4.

The Contract also governed payment of Chesapeake's subcontractors and suppliers. Subsection L, under "Payment Conditions," required Chesapeake to "insure that all subcontractors, employees, and suppliers, at all times [were] paid all amounts due in connection with the performance of this Contract," and submit

---

4. Michael Marinucci Test., Trial Tr. 60:6–9, 61:12–14, July 13, 2011; Pl.'s Ex. 58 at 64:20–66:6 (Michael Marinucci Dep., Nov. 24, 2009).

5. *Id.* Although the provision referred to a "warranty/completion" bond, an attached sample bond protected SG Homes against

Chesapeake's default "in the performance of its obligations under the Contract." *See* Pl.'s Ex. 5, Schedule E. Those obligations included paying subcontractors and suppliers and keeping the project free of liens, as discussed *infra.*

evidence of payments. Pl.'s Ex. 5 at 2. Subsection H, under "General Conditions," required Chesapeake to keep the project free of liens. *Id.* at 5.

Marinucci understood that SG Homes wanted the subcontractors and suppliers on the Crabbs Branch Way project to be paid. *See* Michael Marinucci Test., Trial Tr. 101:22–102:20, July 13, 2011. He also understood that the Contract required Chesapeake to use the money from SG Homes to pay subcontractors working on the project. *See id.* at 128:12–23. Chesapeake's contracts with the subcontractors and suppliers provided that Chesapeake would pay them when it was paid by SG Homes. *See id.* at 103:3–106:1. In addition, Marinucci knew about the Maryland Construction Trust Statute, which requires money given to a contractor by a project's developer to be used only to pay that project's subcontractors. *Id.* at 43:2–10; Md.Code Ann., Real Prop. § 9–201.

On May 14, 2008, Munnikhuysen sent an email to DeVerger to say that Chesapeake's bond [6] had been "cancelled because [Chesapeake] assumed that [SG Homes] no longer wanted it." Pl.'s Ex. 9 at 2. Munnikhuysen noted that the original proposal and Attachment C to the Contract excluded bonds from the scope of work, and the contract price was not increased for the cost of a bond. *Id.*

DeVerger responded the same day, noting that "there may have been a communication breakdown" because SG Homes still needed a bond.[7] Pl.'s Ex. 9 at 1. DeVerger asked how soon Chesapeake could obtain a bond, and at what cost, so that the Contract could be revised. *Id.* About 20 minutes later, Munnikhuysen replied that he had "talked to [Marinucci] via telephone

and [Chesapeake] [would] get the bond right away." Pl.'s Ex. 9 at 1. Marinucci was copied on every email in the exchange. *Id.* at 1–2.

On June 3, 2008, DeVerger emailed Munnikhuysen and asked when the bond would be issued. Pl.'s Ex. 10. Munnikhuysen responded that he would "check again" and "let [DeVerger] know." *Id.* Munnikhuysen copied Marinucci on the email. *Id.*

On June 17, 2008, Munnikhuysen sent DeVerger—and copied Marinucci on—an email with the subject line "Guardrail/bond—Crabbs Branch Way." Pl.'s Ex. 11. Munnikhuysen said that he had received DeVerger's telephone message and forwarded it to Marinucci, who was out of the office but "handling the issues [DeVerger] [had] called about." *Id.*

On September 10, 2008, Randall emailed Marinucci to say that a subcontractor had told SG Homes that it had performed work for Chesapeake in July 2008 but would not be paid until October 2008. Pl.'s. Ex. 13. Randall told Marinucci that he would "pay them directly and back the amount out of [Chesapeake's] next payment." *Id.*

On October 9, 2008, Randall emailed Marinucci about another subcontractor that was owed money from Chesapeake. Pl.'s. Ex. 16. Marinucci responded that the subcontractor should be paid with a "joint check." *Id.*

On October 29, 2008, Randall emailed Marinucci to say that other subcontractors and suppliers had reported that they had not been paid by Chesapeake. Pl.'s. Ex. 15. Randall said that SG Homes would pay them directly "with funds due Chesa-

---

**6.** Munnikhuysen did not specify whether he meant a performance bond, a payment bond, or a bond that insured performance and payment.

**7.** DeVerger also did not specify the type of bond needed.

peake." *Id.* But after the suppliers and subcontractors were paid, SG Homes's "preliminary calculations" indicated that "no money [would] be due Chesapeake." *Id.* SG Homes terminated the Contract. *Id.*

On February 13, 2009, SG Homes sued Chesapeake and Marinucci in the Circuit Court for Montgomery County (the "circuit court") for breach of contract, fraud, and violation of the Maryland Construction Trust Statute. ECF No. 20, Ex. 2.

On January 20, 2010, Marinucci filed for Chapter 7 bankruptcy protection in the bankruptcy court. Bankruptcy Petition No. 10–11253 [hereinafter "Chapter 7 Case"], ECF No. 1. The circuit court stayed SG Homes's suit against Marinucci, pursuant to 11 U.S.C. § 362. ECF No. 20, Ex. 2 at 9 (Docket No. 47). On January 21, 2010, the circuit court entered an order of default against Chesapeake as a discovery sanction. ECF No. 20, Ex. 2 at 8 (Docket No. 45); ECF No. 20, Ex. 1 at 5:17–23.

On April 19, 2010, trial proceeded in the circuit court on SG Homes's damages against Chesapeake. ECF No. 20, Ex. 1 at 5:17–6:1. The following exchange took place:

> Court: You are requesting that I make findings and enter a judgment as to Count 1 of the amended complaint, breach of contract?
>
> Counsel: Correct.
>
> Court: If I do that, do you need to proceed on the remaining counts?
>
> Counsel: Well, the fraud is, essentially, the same as the—the damages are essentially the same as the breach of contract in this case.

> Court: So, you would dismiss the remaining counts?
>
> (Discussion off the record.)
>
> Counsel: We will dismiss the fraud case, Your Honor[.]

*Id.* 20:8–21. The circuit court ruled that Chesapeake had breached its contract, dismissed the remaining counts against Chesapeake, and entered judgment of $208,806.89 for SG Homes. *Id.* 21:14–22:3. The circuit court warned that the judgment was not final, because SG Homes had not voluntarily dismissed the claims against Marinucci. *Id.* at 22:5–25.

On April 23, 2010, SG Homes filed an adversary proceeding against Marinucci in the bankruptcy court, seeking a declaration that Marinucci's debt was nondischargeable because he had "defalcated[8] in his fiduciary duties and capacity as a trustee." Adversary Proceeding No. 10–00252 [hereinafter "Adversary Case"], ECF No. 1 at ¶ 15. SG Homes alleged that Chesapeake had held money in trust for subcontractors, Marinucci had controlled the money, and he had knowingly withheld it from the subcontractors, in violation of the Maryland Construction Trust Statute. *Id.* ¶¶ 13–15. SG Homes sought to recover $208,806.89, plus fees and costs. *Id.* I 16.

On July 14, 2010, Marinucci moved for judgment on the pleadings. Adversary Case, ECF No. 7. He argued that a violation of the Maryland Construction Trust Statute was not a valid basis for objecting to the discharge of his debt. *Id.*, Mem. in Supp. of Mot. for J. on the Pleadings at 3–8.

On July 28, 2010, SG Homes opposed the motion and moved to amend the complaint. *Id.*, ECF Nos. 13, 14. SG Homes argued that the law was unsettled about

---

**8.** "Defalcation is the failure to meet an obligation or a nonfraudulent default." *Rwanda v. Uwimana (In re Uwimana),* 274 F.3d 806, 811 (4th Cir.2001) (internal citation and quotation marks omitted).

whether a violation of the Maryland Construction Trust Statute could be the basis for non-dischargeability. *Id.*, ECF No. 13 at 3–9. SG Homes also moved to amend the complaint to add two claims. *Id.*, ECF No. 14. Proposed Count 2 asserted that Marinucci had committed fraud by misrepresenting Chesapeake's financial condition and its efforts to obtain a bond, and instructing Chesapeake staff to submit false invoices to SG Homes. *Id.*, ECF No. 14–15 at ¶¶ 83–90. Proposed Count 3 was a subrogation claim, asserting fraud on behalf of subcontractors, vendors, and suppliers that were not paid by Chesapeake. *Id.* ¶¶ 91–104.

On September 21, 2010, the bankruptcy court granted Marinucci's motion for judgment on the sole count of the original complaint (violation of the Maryland Construction Trust Statute). Adversary Case, ECF Nos. 22, 23. The court also granted SG Homes's motion to amend the complaint to add the fraud count, but denied the motion to add the proposed subrogation claim. *Id.*, ECF Nos. 22, 24.

On July 13, 2011, trial began on the fraud claim. Marinucci immediately moved for summary judgment on the basis of collateral estoppel. Trial Tr. 5:15–9:2, July 13, 2011. Marinucci argued that, because SG Homes had dismissed its fraud count against Chesapeake in the circuit court, it was barred from pursuing its derivative fraud claim against him in bankruptcy court. *Id.* The bankruptcy court rejected Marinucci's argument, reasoning that the amended complaint alleged that Marinucci himself had made misrepresentations, and liability did not require a finding that Chesapeake had also committed fraud. Trial Tr. 12:22–13:5, July 13, 2011.

SG Homes proceeded on two theories of fraud. First, it asserted that Marinucci had falsely represented that Chesapeake would obtain a payment bond. Trial Tr. 9:21–24, July 20, 2011. Second, it alleged that Marinucci had falsely certified in the monthly payment applications that Chesapeake was paying its suppliers and subcontractors. *Id.* 10:3–9.

At trial, the parties stipulated that SG Homes had paid $208,806.89 to the subcontractors and suppliers that had worked on the Crabbs Branch Way project and not been paid by Chesapeake. Trial Tr. 131:12–132:20, July 13, 2011. Randall testified that none of the money came from funds owed Chesapeake, and he explained how he calculated the figure using invoices, balance sheets, and Chesapeake's payment applications. Lorin Randall Test., Trial Tr. 115:15–119:22, July 14, 2011. He also testified that, had he known in January or February 2008 that Chesapeake would not obtain a bond, SG Homes would not have awarded the contract to Chesapeake or allowed it to start work. *Id.* at 61:15–24. He testified that, had he known after executing the Contract that Chesapeake would not obtain a bond, SG Homes would have paid the subcontractors and suppliers directly, or worked out an agreement with Chesapeake to issue joint checks. *Id.* at 57:4–18.

Marinucci testified that when SG Homes paid the subcontractors and suppliers, it owed Chesapeake $277,000. Michael Marinucci Test., Trial Tr. 122:12–21, July 14, 2011. He presented no supporting exhibits, however, and conceded during cross examination that he had not reviewed the invoices used in Randall's calculations. *Id.* at 125:15–126:2. A spreadsheet of unpaid bills, created by Chesapeake, showed that the company owed $534,543.80 to vendors in November 2008. Pl.'s Ex. 52 at 3. The court also heard portions of Marinucci's depositions, in which he had testified that he had not tried to secure a bond for the project. *See* Michael Marinucci Test., Trial Tr. 43:11–44:1, July 13, 2011.

The court found that the parties had agreed that Chesapeake would obtain a bond that insured payment. Trial Tr. 13:5–10, 19:15–18. The court also found that Marinucci had misrepresented Chesapeake's intent to obtain the bond. *Id.* 13:5–20:16. Specifically, the court found that:

- Marinucci had completed—but never submitted—a bond request form seeking performance and payment bonds. Although Marinucci took "an initial look at whether a bond might be available," he decided not to obtain it after learning it would require a personal guaranty. *Id.* at 16:17–17:1, 17:11–23, 18:18–22.
- The "P & P bond" in Munnikhuysen's March 26, 2008 email to Randall meant "payment and performance bond." *Id.* 13:5–14. By then, Marinucci had decided not to obtain a bond. Marinucci was copied on the email, understood that Munnikhuysen was promising a performance and payment bond the next week, and breached his duty to SG Homes to correct this false statement. *Id.* at 13:15–14:1, 18:13–17.
- The May 14, 2008 email that Munnikhuysen sent to DeVerger—and copied to Marinucci—was "intentionally misleading." The email said that Chesapeake's bond had been canceled, but the company had never acquired a bond. *Id.* at 14:2–17.
- The June 3, 2008 email that Munnikhuysen sent to DeVerger—and copied to Marinucci—was misleading, because it implied that Chesapeake was still in the process of obtaining a bond. *Id.* at 14:18–25.
- The June 17, 2008 email that Munnikhuysen sent to DeVerger—and copied to Marinucci—was misleading because it implied that there was a bond "to check on." *Id.* at 15:21–25.

The bankruptcy court also found that Marinucci had lied in the certifications in the monthly payment applications, because Chesapeake had not used the money from SG Homes to pay only subcontractors and suppliers connected to the Crabbs Branch Way project. Trial Tr. 20:17–23:8, July 20, 2011.

The bankruptcy court found that damages were $208,806.69—the amount SG Homes had "double paid" for the suppliers and subcontractors. Trial Tr. 25:16–19, July 20, 2011. The court rejected Marinucci's argument that it should reduce the damages by the amount SG Homes owed Chesapeake for services already provided. *Id.* at 24:18–25:2. Crediting SG Homes's evidence over Marinucci's "unsupported testimony," the court found that "there was an ultimate deficit on this job" after SG Homes paid the suppliers and subcontractors. *Id.* 25:3–15.

The court further found that the judgment debt was not dischargeable, because Marinucci had drawn a $150,000 salary from Chesapeake and

> [w]ithout revenue[,] the company would fail, [and] when the company failed[,] the salary would stop. When the company ... fail[ed,] the investment, the 50 percent ownership interest, would go from whatever value it may have had to zero[.]

Trial Tr. 29:12–30:11, July 20, 2011.

On September 7, 2011, Marinucci filed his notice of appeal. ECF No. 1. On October 13, 2011, SG Homes filed its notice of cross-appeal. ECF No. 12.

## II. Analysis

### A. Standard of Review

■ The Court reviews the bankruptcy court's findings of facts for clear error and conclusions of law de *novo*. *See Duncan v.*

*Duncan (In re Duncan)*, 448 F.3d 725, 728 (4th Cir.2006). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." [9] "A reviewing court will not reverse simply because it is convinced that it would have decided the case differently." [10]

### B. Marinucci's Appeal

Marinucci argues that the adversary proceeding should have been dismissed because the circuit court judgment collaterally estopped SG Homes from suing him in bankruptcy court. ECF No. 3 at 9–16. He argues alternatively that the bankruptcy court erred in awarding SG Homes a non-dischargeable judgment because SG Homes failed to establish fraud. *Id.* at 16–40.

#### 1. Collateral Estoppel

■■■ The doctrine of collateral estoppel bars "successive litigation of an issue ... actually litigated and resolved in a valid court determination essential to the prior judgment." *Taylor v. Sturgell*, 553 U.S. 880, 892 & n. 5, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008) (internal quotation marks omitted). To determine whether the circuit court judgment against Chesapeake collaterally estopped the federal bankruptcy litigation against Marinucci, the Court applies the collateral estoppel law of Maryland. *See In re Duncan*, 448 F.3d at 728.

■■■ In Maryland, collateral estoppel bars relitigation of an issue when: (1) the issue in the present dispute is identical to that decided in an earlier dispute; (2) there was a final judgment on the merits in the earlier proceeding; (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the earlier proceeding; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to be heard on the issue. *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 761 A.2d 899, 910 (2000).

■■■ Marinucci argues that collateral estoppel barred the adversary action because SG Homes sought to hold him liable, as a corporate officer, for Chesapeake's torts. ECF No. 3 at 10. He contends that SG Homes was barred from claiming in bankruptcy court that Chesapeake had committed fraud, because it waived that claim when it dismissed it in the circuit court.[11] He argues that "without a corporate tort, there can be no liability of the officer." *Id.* at 10.

SG Homes counters that collateral estoppel does not apply to a voluntary dis-

---

9. *Montgomery County v. Barwood, Inc.*, 422 B.R. 40, 44 (Bankr.D.Md.2009) (*citing Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (internal quotation marks omitted)).

10. *Citizens Bank of Md. v. Broyles (In re Broyles)*, 55 F.3d 980, 983 (4th Cir.1995) (*citing Anderson*, 470 U.S. at 573, 105 S.Ct. 1504) (internal quotation marks omitted).

11. *Id.* at 10. To the extent that Marinucci argues that waiver is a separate ground for reversing the bankruptcy court, *see* ECF No. 3 at 11, the argument fails on its merits. "Waiver is the intentional relinquishment of a known right ..." *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Centre at Parole, LLC*, 421 Md. 94, 25 A.3d 967, 983 (2011). In Maryland, a plaintiff "may proceed against any one of several joint tortfeasors regardless of the others." *Gordon v. Opalecky*, 152 Md. 536, 137 A. 299, 304 (1927) (*cited in Cooper v. Bikle*, 334 Md. 608, 640 A.2d 1120, 1125 (1994)). Thus, SG Homes did not waive its right to pursue a fraud claim against Marinucci when it dismissed its fraud claim against Chesapeake. Moreover, Marinucci waived this affirmative defense by not raising it in his answer. *See infra* note 12.

missal without prejudice, and Marinucci waived the defense of collateral estoppel by not pleading it in his answer. ECF No. 20 at 14–20.

Although Marinucci waived this argument by not raising it in his answer,[12] the bankruptcy court did not err in denying Marinucci's motion for summary judgment on the merits. First, there was no final judgment in the circuit court. *See* ECF No. 20, Ex. 1 at 22:5–25. After receiving judgment on its breach of contract claim, SG Homes voluntarily dismissed the fraud claim against Chesapeake. *Id.* at 20:8–21. But it did not dismiss the claims against Marinucci. *Id.* at 22:5–25. Because the circuit court order did not adjudicate all pending claims, it was not a final judgment, and collateral estoppel did not apply.[13]

 Second, the fraud claim against Chesapeake was not "actually litigated" in the circuit court, so there was no judgment on the merits.[14] "What matters for purposes of collateral estoppel is not that a suit or a cause of action has been dismissed," but that "an issue of ultimate fact has once been determined." *Puller*, 899 A.2d at 893 (internal citation omitted). A voluntary dismissal may "not remotely entail any actual litigation of factual issues." *See id.* at 898–99. Because SG Homes dismissed the fraud claim, those allegations were not litigated on the merits, and collateral estoppel did not apply.[15] The bankruptcy court did not err in denying Marinucci's oral motion for summary judgment.

### 2. Proof of Fraud

Marinucci argues alternatively that the bankruptcy court erred by entering a nondischargeable judgment against him, because SG Homes failed to prove two elements of fraud: reliance and damages. ECF No. 3 at 16–40.

Absent a statutory exception, a debtor's obligations are discharged after Chapter 7 bankruptcy proceedings. *See* 11 U.S.C. § 523(a) (identifying 19 statutory exceptions to discharge). SG Homes objected to the discharge of Marinucci's debt under 11 U.S.C. § 523(a)(2), which disallows the discharge of a debt obtained by fraud.

#### a. Reliance

 To establish fraud, a plaintiff must show, *inter alia*, that it actually relied on the debtor's misrepresentations, and it was justified in doing so because of

---

**12.** "Ordinarily, under the Bankruptcy Rules as under the Civil Rules, a defense is lost if it is not included in the answer or amended answer." *Kontrick v. Ryan*, 540 U.S. 443, 459–60, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004). *See also* Fed.R.Civ.P. 8(c) ("In responding to a pleading, a party must affirmatively state any … affirmative defense, including … estoppel … and waiver."); Fed. R. Bankr.P. 7008 (Fed.R.Civ.P. 8 applies in adversary proceedings).

**13.** *See* Md. R. 2–602(a) (a court order "adjudicating fewer than all of the claims in an action … is not a final judgment"). In addition, SG Homes did not expressly move to dismiss the fraud claim against Chesapeake with prejudice, so the dismissal did not bar SG Homes from relitigating that claim. *See*

Md. R. 2–506(c) ("Unless otherwise specified …, a dismissal is without prejudice[.]").

**14.** *See Lawrence Steel Erection Co., Inc. v. Piercy (In re Piercy)*, 140 B.R. 108, 113 (D.Md. 1992) ("The doctrine of collateral estoppel … [is] applicable to dischargeability claims …. when the facts and issues have been actually litigated by the state court and were necessary to the state court decision."); *John Crane, Inc. v. Puller*, 169 Md.App. 1, 899 A.2d 879, 893 (2006) ("the *sine qua non* is that the factual issue was actually litigated on its merits in the earlier case").

**15.** *See Puller*, 899 A.2d at 899 (collateral estoppel did not apply when plaintiff voluntarily dismissed claim and "no issue of fact was ever litigated").

its "qualities and characteristics" and "the circumstances of the particular case." [16] Although a creditor is not entitled to "blindly rely" on a patently false statement, it is justified in relying on a representation of fact even if it "might have ascertained the falsity of the representation had [it] made an investigation." *In re Sharp*, 340 Fed.Appx. at 906–07 (internal quotation marks omitted) (*citing Field*, 516 U.S. at 70–71, 116 S.Ct. 437). Reliance is a factual issue, and the bankruptcy court's finding will not be set aside unless clearly erroneous. *Id.* at 906.

Marinucci argues that SG Homes relied on neither his promise to obtain a payment bond, nor false certifications in the payment applications. ECF No. 3 at 17.

i. Misrepresentations About the Bond

▮ Marinucci contends that SG Homes could not have relied on his promise to obtain a payment bond because it drafted and executed the Contract, which did not require a bond.[17] He argues that any post-Contract failure to correct false statements was not fraud, and SG Homes waived any right to require a bond by allowing Chesapeake to work for months without obtaining a bond. ECF No. 3 at 25–28.

SG Homes counters that, until May 12, 2008, the terms of the parties' agreement were governed by all their communications, which established that a bond was required. ECF No. 20 at 25–26. After the Contract was executed, SG Homes exercised its right to demand a bond, and Marinucci allowed Munnikhuysen to falsely represent that Chesapeake would "get on the bond right away." *Id.* at 26. SG Homes argues that Randall showed reliance by testifying that, had he known Chesapeake was not going to obtain a bond, SG Homes would not have awarded Chesapeake the job, or would have taken other steps to avoid "pay[ing] twice for the same work and materials." *Id.* at 27.

The Court finds ample evidence of reliance to support the conclusion that Marinucci committed fraud by lying about his efforts to obtain a bond. Randall testified that, had he known in January or February 2008 that Chesapeake would not obtain a bond, SG Homes would not have awarded the contract to Chesapeake or allowed it to start work. Lorin Randall Test., Trial Tr. 61:15–24, July 14, 2011. He also testified that, had he known after executing the Contract that Chesapeake would not obtain a bond, SG Homes would have paid the subcontractors and suppliers directly, or worked out an agreement with Chesapeake to issue joint checks. *Id.* at 57:4–18. From this testimony, the bankruptcy court reasonably concluded that SG Homes had actually relied on Marinucci's false statements about the bonds.[18]

---

**16.** *Colombo Bank v. Sharp (In re Sharp)*, 340 Fed.Appx. 899, 906 (4th Cir.2009) (internal quotation marks omitted), *citing Field v. Mans*, 516 U.S. 59, 68, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

**17.** ECF No. 3 at 19–23. He argues that any ambiguity in the Contract must be construed against SG Homes as the party that drafted the agreement. ECF No. 3 at 23–24.

**18.** The Court rejects Marinucci's argument that SG Homes waived the bond requirement by allowing Chesapeake to begin work without a bond, and drafting a contract that did not require a bond. *See* ECF No. 3 at 27–28. Because SG Homes did not know that Marinucci was lying when he promised that Chesapeake would get a bond, SG Homes did not intentionally relinquish its right to the bond by allowing work to begin. *See Hovnanian Land Inv. Grp., LLC*, 421 Md. 94, 25 A.3d at 983. Moreover, the Contract allowed SG Homes to require a bond "at any time," even if a bond had not been required at the outset. *See* Pl.'s Ex. 5 at 6. Thus, SG Homes did not relinquish its right to a bond when it drafted the Contract.

## ii. False Certifications

Marinucci also contests the bankruptcy court's finding of fraud on the basis of false certifications in the payment applications. ECF No. 3 at 28–30. He contends that the applications required Chesapeake to certify only that it used SG Homes's money to pay Chesapeake subcontractors and suppliers, not that it used the money to pay only vendors providing supplies or services to the Crabbs Branch Way project. *Id.* at 28–29. SG Homes argues that Marinucci ignores the parties' intent and the plain language of the Contract, which the Court must read in conjunction with the certifications. ECF No. 20 at 28–30.

■■■ "[W]here a writing refers to another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing."[19] The certifications in the applications stated that SG Homes's payments to Chesapeake had been made "in accordance with the Contract Documents," and "all amounts previously paid to [Chesapeake] under the Contract ha[d] been used to pay [Chesapeake's] costs for labor, materials, and other obligations." *See* Pl.'s Ex. 31A at 1. Thus, the Court must read the certifications and the Contract together.

The certifications required Chesapeake to use the money from SG Homes to pay only the subcontractors and suppliers working on the Crabbs Branch Way project. The Contract provided that Chesapeake had to pay all subcontractors and suppliers "all amounts due in *connection with the performance of the Contract.*" *See* Pl.'s Ex. 5 at 2 (emphasis added). Moreover, Marinucci understood that, when SG Homes paid Chesapeake, Chesapeake was to use that money to pay the subcontractors who worked on the Crabbs Branch Way project. *See* Michael Marinucci Test., Trial Tr. 128:12–23, July 13, 2011. Indeed, Chesapeake's contracts with its subcontractors and suppliers promised payment only after it received money from SG Homes. *See id.* at 103:3–106:1. In addition, the Contract incorporated the Maryland Construction Trust Statute,[20] which required Chesapeake to use money it received under the Contract to pay only the subcontractors and suppliers that had worked on the Crabbs Branch Way project. *See* Md.Code Ann., Real Prop. § 9–201.

Accordingly, the Court will uphold the bankruptcy court's findings that SG Homes relied on Marinucci's false promises to obtain a bond, and his false certifications in the payment applications.

### b. Damages

■■■ A fraud plaintiff objecting to the discharge of debt in bankruptcy must also show that the defendant's misrepresentation proximately caused the plaintiff's damages. *In re Sharp*, 340 Fed.Appx. at 901. Under Maryland law, a fraud victim may recover its out-of-pocket expenses.[21] "A court's calculation of damages is a find-

19. *Ray v. William G. Eurice & Bros., Inc.*, 201 Md. 115, 93 A.2d 272, 279 (1952) (*cited in Wells v. Chevy Chase Bank, F.S.B.*, 377 Md. 197, 832 A.2d 812, 831 (2003)).

20. *See Hearn v. Hearn*, 177 Md.App. 525, 936 A.2d 400, 406 (2007) ("Parties to a contract are presumed to contract mindful of the existing law, and all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intention is evident.").

21. *Goldstein v. Miles*, 159 Md.App. 403, 859 A.2d 313, 324 (2004) (internal quotation marks omitted). Alternatively, a fraud victim may seek "benefit-of-the-bargain damages," which "put[ ] the defrauded party in the same financial position as if the fraudulent representations had in fact been true." *Id.* SG Homes recovered out-of-pocket expenses.

ing of fact and therefore is reviewable only for clear error, but to the extent those calculations were influenced by legal error, review is *de novo*." [22]

Assuming that SG Homes could recover only the benefit of its bargain,[23] Marinucci argues that it did not incur damages of $208,806.89 when it directly paid Chesapeake's subcontractors and suppliers. ECF No. 3 at 32–33. He contends that SG Homes owed Chesapeake $277,000, and "SG Homes's decision . . . to instead use that money to pay Chesapeake's subcontractors and suppliers, does not translate into SG Homes suffering any damages." *Id.* at 34.

SG Homes counters that (1) Marinucci stipulated that SG Homes paid $208,806.89 to the subcontractors and suppliers, (2) Randall explained in detail how he arrived at that figure, and (3) Marinucci's testimony that SG Homes owed Chesapeake $277,000 is unsupported by the evidence. ECF No. 20 at 31–33.

As a preliminary matter, the Court finds that no legal error influenced the bankruptcy court's damages calculation. Contrary to Marinucci's contention, SG Homes was entitled to recover its out-of-pocket expenses rather than benefit-of-the-bargain damages. *See Goldstein,* 859 A.2d at 324. Thus, the Court will review the bank-

ruptcy court's damages calculation for clear error. *See Universal Furniture Int'l, Inc.,* 618 F.3d at 427.

■ The Court finds no error in that determination. The evidence before the bankruptcy court included the party's stipulation that SG Homes had paid the subcontractors and suppliers $208,806.89, Randall's testimony about how he calculated that figure, and Chesapeake's spreadsheet showing that it still owed more than $534,000 to vendors in November 2008.[24] The bankruptcy court was free to give more weight to this evidence than the testimony of Marinucci,[25] who conceded that he had not reviewed the invoices used in Randall's calculations, and provided no documentary support for his assertion that Chesapeake was owed $277,000.[26] Accordingly, the Court will affirm the bankruptcy court's finding of fraud and entry of non-dischargeable judgment for SG Homes.

### C. SG Homes's Cross Appeal

SG Homes argues that the bankruptcy court erred in dismissing the original claim under 11 U.S.C. § 523(a)(4), which disallows discharge of a debt "for fraud or defalcation while acting in a fiduciary capacity." ECF No. 20 at 36. SG Homes concedes, however, that the alleged error

---

**22.** *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.,* 618 F.3d 417, 427 (4th Cir.2010) (internal citation and quotation marks omitted).

**23.** *See* ECF No. 3 at 31 ("The starting point for this analysis is the measure of damages for a breach of contract. . . . This measure of damages has also been referred to as the 'benefit of the bargain' measure[.]"). Elsewhere in his opening brief, Marinucci appears to conflate the two measures of damages. *See id.* at 37 ("The way to calculate the 'out of pocket' or 'benefit of the bargain' losses in this case is actually quite simple.").

**24.** *See* Trial Tr. 131:12–132:20, July 13, 2011; Lorin Randall Test., Trial Tr. 115:15–119:22, July 14, 2011; Pl.'s Ex. 52.

**25.** "[A]ssessing the weight of the evidence and the credibility of witnesses is within the sole province of the fact-finder." *Parris v. Lynch,* 35 F.3d 556 (table), 1994 WL 486549, at *1 (4th Cir.1994).

**26.** Michael Marinucci Test., Trial Tr. 122:12–21, 125:15–126:2, July 14, 2011. Had the bankruptcy court believed Marinucci, it would not have erred in accepting SG Homes's damages calculation: $277,000 would not have satisfied the more than $534,000 in unpaid invoices. *See* Pl.'s Ex. 52.

"will have no adverse consequence" if the Court affirms the judgment in its favor. *See* ECF No. 20 at 41. Because the Court will affirm the judgment for the reasons stated above, it need not address the merits of SG Homes's cross appeal.[27]

## III. Conclusion

For the reasons discussed above, the bankruptcy court will be affirmed.

**27.** *See, e.g., Lee v. Lockheed Martin Operations Support, Inc.*, 203 Fed.Appx. 505, 507 (4th Cir.2006) (per curiam) (affirming the judgment of the lower court and, thus, finding "no occasion to address the claim presented in [the] cross-appeal"); *Handley v. Union Carbide Corp.*, 804 F.2d 265, 271 n. 23 (4th Cir.1986) (declining to consider alleged errors raised in the cross appeal, because they did not affect the lower court's judgment for the cross appellant, which was affirmed). *Cf. Troy v. City of Hampton*, 756 F.2d 1000, 1010 (4th Cir.1985) ("[W]here an error below does not prejudice the substantial rights of the parties, an appellate court must find that the error was harmless and refuse to reverse and remand."); *Stevens v. Showalter*, 458 B.R. 852, 857 (D.Md.2011) (finding that, "even if the Bankruptcy Court erred ..., any such error was harmless since [the appellant] suffered no prejudice as a result").